United States Court of Appeals,

Fifth Circuit.

No. 91–2794.

JAMES C. THOMAS, As Trustee of SLT Trust # 1 (Rev): 9/29/83, Plaintiff–Appellant,

v.

E. LAWRENCE PRICE, As Trustee of the Elaine Price Trust 1983, Et Al., Defendants–Appellees.

Oct. 21, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before JONES and WIENER, Circuit Judges, and WALTER,[*]istrict Judge.

EDITH H. JONES, Circuit Judge:

This case is the result of a bitter dispute between former partners in a private banking enterprise. The trial of their protracted litigation leads from New York to Texas. The district court granted the defendants summary judgment, dismissed the SLT Trust from the action, and dismissed all of the plaintiff's claims except one. The principal issues raised in this appeal concern the consequences of foreclosure on a partnership interest held as collateral. We affirm the district court's decision, *see* 718 F.Supp. 598 (S.D.Tex.1989), on modified reasoning.


FACTS

Appellant James C. Thomas (Thomas) is the trustee of the SLT Trust (SLT), a trust created under Missouri laws. Earl Lawrence Price is the trustee of the Elaine Price Trust (Price I) and the son of Earl Raymond Price, who is the trustee of a second trust for Elaine Price (Price II). On or about November 4, 1983, SLT and Price I entered into a partnership agreement for the acquisition and operation of the Church & Thomas Bank (the Bank), one of the few remaining private banks in Texas. At that time, Thomas was already part owner of the Bank.

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

Also in early November 1983,[1] SLT and Price I each borrowed $750,000 from Newcomb Securities Company (Newcomb), a business owned by the family of Lawrence Price, and of which Lawrence Price was the managing and general partner.[2] In exchange for these loans, SLT and Price I each separately executed a nonrecourse promissory note to Newcomb payable on or before November 7, 1985. Each trust also executed a separate security agreement (Security Agreement) with Newcomb.

The Partnership subsequently acquired the Bank. In accordance with the Partnership Agreement, a four-person Management Committee was appointed to manage the Bank. SLT appointed Thomas and Bernard Gram. Price I appointed Lawrence Price and Peter Jacoby. The Bank's Management Committee entered into separate management contracts with Thomas, who became the Bank's general manager, and Lawrence Price, who became its chairman. From the Partnership's inception, Thomas and Lawrence Price were unable to agree upon management strategy. The hostilities between them led Newcomb to suspect that SLT would default on its loan obligations when they came due. In anticipation of SLT's possible default, Newcomb assigned the nonrecourse note and the Security Agreement to Price II in exchange for a full-recourse promissory note for $750,000 due November 7, 1986.

On November 7, 1985, when SLT's nonrecourse note to Newcomb came due, neither Thomas nor SLT made any payment to either Newcomb or its assignee, Price II. The following day, Raymond Price, as trustee for Price II, advised Thomas of Newcomb's assignment and demanded payment within ten days. When no payment was made by November 18, a default occurred. In a letter dated November 26, 1985, Raymond Price notified Thomas of Price II's intention to retain

[1]Although the New York district judge found that the loans were made on November 4, 1983, *see Thomas v. Price,* 631 F.Supp. 114, 115 (S.D.N.Y.1986), the appellant states that the loans were made on November 16, 1983, *see* Appellant's Brief at 5.

[2]The only appellee who filed a brief in this case is Gila Rosenhaus Wiener, a limited partner in Newcomb.

SLT's "interest in the partnership," under section 4.2 of the Security Agreement between SLT and Newcomb, in satisfaction of the obligations under the SLT–Newcomb promissory note unless Price II received a written notice of objection within 21 days. The letter notified SLT that if SLT objected to this proposal, the "collateral" would be disposed by private or public sale as authorized by section 9–504(1)(c) of the Uniform Commercial Code (U.C.C.). SLT did object in a letter dated December 11, 1985, and insisted that "any disposition of the subject collateral must be pursuant to Section 9–504 of the Code" and further requested notice of any public or private sale.

Nine days later, Price II notified SLT in writing that a private sale of the collateral would be held on or after January 8, 1986.[3] In addition, Price II informed SLT that Thomas and Bernard Gram were being replaced on the Bank's Management Committee by Raymond Price and Elaine Price, who were being appointed by Price II in order to preserve the collateral. Thomas promptly objected to his and Gram's removal from the Management Committee. Counsel for the Prices responded that the sale of SLT's partnership interest would be "abandoned" if Thomas made Price II a written offer to purchase its interest in the Partnership, for a specified cash price, by the close of business on January 7, 1986. Upon receipt of such an offer, Price II would decide within 48 hours whether to sell the partnership interest back to Thomas or to purchase the interest itself on the same terms.

Thomas declined to buy or pay off SLT's nonrecourse note and insisted that Lawrence Price honor the indemnification agreements comprising the Stanhope Transaction.[4] Taking an offensive

---

[3]The letter actually said "1985," but both parties agree that this was a typographical error and that the sale was to be in 1986. Recognizing the error, the Prices later adjusted the earliest date of sale to January 14.

[4]The Stanhope Transaction refers to two agreements by the Prices to indemnify Thomas Construction Company for payments totalling $750,000. Thomas argued below that Thomas Construction Company entered into these indemnity agreements as a "quid pro quo" for the money loaned to SLT by Newcomb. Thomas also argued that his decision not to pay the amount due on the nonrecourse note was based on the failure of the Prices to honor the two indemnity agreements constituting the Stanhope Transaction. The New York district court made "an informed finding" that the Stanhope Transaction was not relevant to the proceedings. This finding was based on the fact that "the Stanhope Transaction is nowhere mentioned in either the partnership agreement or the security agreement." *Thomas v. Price,* 631 F.Supp. 114, 116 n. 2

tack, Thomas' counsel made objections to a certain transaction known as the Enterprise Transaction that the Bank had engaged in after Thomas' ouster and without his approval.[5]  Thomas' attorney also objected to the commercial reasonableness of any private sale of the collateral to either Lawrence Price or a Price affiliate.

The Prices' counsel responded to these charges and, on January 9, wrote Thomas and again offered him, as trustee of SLT, prior notice of any sale of the collateral and an opportunity to buy the collateral on the same terms as those provided for in the proposed sale.  Shortly afterward, Thomas received notice that the private sale of the collateral would take place on January 28, 1986.  Thomas was advised that SLT could redeem its partnership interest by paying the interest owed on its note and by converting the note into a full-recourse note that would be due and owing on November 7, 1986.  SLT responded in a letter stating that if any purchaser of the collateral attempted to interfere with Thomas' management interest in the Bank, he would "take all steps necessary to protect the interest of both the Bank and SLT, including invoking the supervision of the Texas Banking

---

(S.D.N.Y.1986).

[5]The Enterprise Transaction was a $1.5 million unsecured loan to Enterprise Partners, a limited partnership in which Lawrence Price was a principal.  Thomas described the transaction as follows:

> [J]ust prior to December 31, 1985, [Lawrence Price] deposited approximately $1.5 million in the Bank in the form of a certificate of deposit on behalf of Newcomb Securities Company.  Simultaneously, however, he had the bank make a loan of approximately $1.5 million to Enterprise Partners, Ltd., an entity in which he is the principal.  The loan from the bank was evidenced by an *unsecured* note payable by Enterprise Partners, Ltd. to the Bank and having a term of six days.  These transactions were undertaken by Mr. Price without informing me and completely without my consent as General Manager of the bank.

Thomas affidavit ¶ 15 (emphasis in original).  The money was transferred by Enterprise Partners to Brittenum & Associates, Inc., an Arkansas securities firm on the verge of bankruptcy.  *Thomas v. Price,* 718 F.Supp. 598, 602 n. 26 (S.D.Tex.1989).  Enterprise Partners used the loan to pay a week's interest on a loan of over $1 billion designed to generate more than $2.5 million in fraudulent tax losses and deductions for Enterprise Partners.  *Id.*  Brittenum repaid the loan on January 2, and the bank then wire transferred the $1.5 million back to Newcomb.  SLT claims that the Enterprise Transaction constituted fraudulent self-dealing by the Prices and exposed the bank to enormous liability to the Trustee in Bankruptcy and the creditors of Brittenum.  *Id.*

Commissioner."

On January 23, Thomas, individually and as trustee of SLT, filed suit in a New York state court and sought and obtained a temporary restraining order (TRO) against the Prices to prevent their assumption of Thomas' management rights and the sale of the collateral. Before the scheduled hearing on Thomas' application for a preliminary injunction, the Prices removed Thomas' action to federal court, where the hearing on injunctive relief was consolidated with the merits of the case. The New York district court denied Thomas' application for relief. Thomas appealed. On May 9, 1986, while the appeal was pending in the Second Circuit, Thomas filed the present action seeking, *inter alia,* dissolution of the partnership. The appeal in the Second Circuit was dismissed by the consent of the parties on May 30, 1986. Although Price II could have consummated the sale of the collateral at that point, it did not, and on August 29, 1986, the plaintiffs moved the Texas district court to issue a TRO to prevent the sale of the collateral. The court denied this motion, but stayed its effective date until September 10, 1986. On that day, after the stay expired, Price II sold the collateral to the Lawrence Price Trust (Price III). Neither Thomas nor SLT attempted to purchase the collateral at the sale.

Thomas' complaint in this case alleged a number of causes of action, including: (1) a request for dissolution of the partnership and accounting; (2) breach of the Partnership Agreement; (3) breach of the SLT–Newcomb Security Agreement; (4) civil conspiracy to misapply partnership property and funds; (5) RICO violations by the Bank managers; (6) intentional interference with the Bank's operations; (7) negligent representation; (8) breach of Thomas' management agreement with the Bank; and (9) an improper call for further capital contribution.

On June 14, 1989, the district court granted summary judgment for the defendants on all counts except the one alleging a breach of the management agreement between Thomas and the Bank. This claim went to trial, and on May 24, 1991, the district court entered a judgment awarding

Thomas $350,000 in management fees and expenses against the Bank. About two years earlier, however, the Bank had collapsed, and the Texas Banking Commissioner had been appointed its liquidator. The district court then dismissed the counterclaims of the Prices against Thomas and SLT. SLT has appealed, raising several issues, the most important of which are: (a) whether notwithstanding the attempt of Price II to foreclose, SLT has standing to assert causes of action available to a partner; and (b) whether the private foreclosure by Price II complied with section 9.504 of the Texas U.C.C. because Price III allegedly did not act in good faith.

## DISCUSSION

### 1. *Standard of Review*

We review a summary judgment *de novo. Degan v. Ford Motor Co.,* 869 F.2d 889, 892 (5th Cir.1989). A summary judgment may be granted if there is "no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Guthrie v. Tifco Indus.,* 941 F.2d 374, 376 (5th Cir.1991), *cert. denied,* ─── U.S. ──, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2510. To avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case. Unsubstantiated assertions of an actual dispute will not suffice. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

### 2. *SLT's Partnership Status After Default*

Under the Texas Uniform Partnership Act (TUPA), a partnership "is an association of two or more persons to carry on as co-owners a business for profit." Tex.Rev.Civ.Stat.Ann. art. 6132b, § 6 (Vernon 1970). The primary indicia of a partnership relationship are an agreement, explicit or implicit, among the participants to share profits and losses and to share control of the partnership

enterprise. Under Texas law, a "partner's interest" is defined as the partner's "share of the profits and surplus," *Id.* § 26, is personalty, *id.,* and is a property right that is distinguishable from a partner's "right to participate in the management" of the partnership. *See id.* § 24. It does not follow, however, that an assignment of a partnership interest can never include the right to participate in the management of the partnership. Section 27 of the TUPA assumes the ability of a partner to transfer the partner's right to participate in the management. That section states:

> A conveyance by a partner of his interest in the partnership does not *of itself* dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs; it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled and, for any proper purpose, to require reasonable information or account of partnership transactions and to make reasonable inspection of the partnership books.

*Id.* § 27(1) (emphasis added). Section 27 contemplates the possibility that the assignee of a partner's interest might be entitled to participate in management decisions—as long as the non-assigning partners agree to such participation—for the TUPA also directs that "[n]o person can become a member of a partnership without the consent of all the partners." Tex.Rev.Civ.Stat.Ann. art. 6132b, § 18(g) (Vernon 1970). This conclusion is consistent with the general rule that the assignee of a partnership interest may not interfere in the management of a partnership. *Thomas v. American National Bank,* 704 S.W.2d 321, 323 (Tex.1986). The parties may, of course, provide otherwise in the partnership agreement.

The pertinent questions in this case are what rights SLT's Security Agreement granted Newcomb in the event of default and what effect Price II's foreclosure had on SLT's partnership interest. The SLT–Price I Partnership Agreement expressly authorized the partners to grant a security interest in their shares of the profits and surplus of the business. Partnership Agreement § 17(c). The Partnership Agreement also provided that granting a security interest would neither "dissolve the partnership nor in any way affect or diminish each partner's continuing right to management and control of the partnership nor entitle the secured party to interfere in the

management or administration of the partnership business or affairs." *Id.* The district court found that neither this provision nor the TUPA "prohibit[s] the assignment of a partner's interest in the profits and surplus along with an assignment of that partner's management rights." *Thomas v. Price,* 718 F.Supp. at 606.

The Security Agreement between SLT and Newcomb granted a security interest in SLT's "right, title and interest in its interest in the Partnership, as such interest is defined by section 26 of the Uniform Partnership Act of the State of Texas." Security Agreement § 1. The Security Agreement also provided that Newcomb would have a security interest in whatever "proceeds" SLT received from its interest in the Partnership. *Id.* Furthermore, the Security Agreement provided that Newcomb would have "no right to interfere in the management, administration, affairs, or control of the partnership" in the absence of an "Event of Default." *Id.* "Event of Default" was defined elsewhere in the Security Agreement to include the failure of SLT to pay the nonrecourse note "when due, provided that such failure continued for ten days after written notice of default." *Id.* § 4.1(a).

Certain of Thomas' claims against the Prices arise out of SLT's asserted retention of all partnership rights. Only if SLT continued to retain full partnership rights after Price II asserted its right to foreclose on November 26, 1985, can SLT sue: (1) for dissolution and accounting of the partnership; (2) for damages, as a partner, for alleged post-November misdeeds against the partnership by Price I; and (3) and for post-default RICO violations. The New York district court found that the language of the Security Agreement could be rendered meaningful only if it were construed as an affirmative grant of a right to interfere in the "management, administration, affairs, or control" of the Bank upon default. *Thomas v. Price,* 631 F.Supp. 114 (S.D.N.Y.1986). This result has been soundly criticized as being inconsistent with the Partnership Agreement. *See* Allen R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Partnership,* § 3.05(c)(4) (1991) ("The assignment of management rights is so clearly inconsistent with the partnership standard form that the court should have required a stronger showing that the partners intended this variance.") The

Texas district court noted that any right to interfere in the management of the Bank that Price II gained could be exercised only with the agreement of the remaining partner. *Thomas v. Price,* 718 F.Supp. at 606. The Texas district court also found that upon Price II's exercise of its rights following default, the Partnership Agreement and Security Agreement deprived SLT of its partner status as a matter of law. Consequently, after November 26, 1985, SLT was no longer a partner and had no standing to assert a partner's causes of action. Specifically, the district court found:

> [O]nce SLT lost its rights to profits and surplus and management, SLT ceased to be a partner because the major criteria necessary for establishing partnership status must continually [sic] exist to maintain that status. When both elements cease to exist, logic dictates that partnership status is lost. Accordingly, SLT ceased to be a partner on November 26, 1985, the date Price II took constructive possession of the collateral.

*Thomas v. Price,* 718 F.Supp. at 607. The court added that the SLT–Price I partnership then dissolved under Texas law and the Partnership Agreement.[6]

Although strong arguments can be made to support the district court's holding, the resolution of this case does not require such a broad holding. It is undisputed that the default transferred SLT's "right, title and interest in the Partnership" to Price II, subject only to SLT's right to redeem. Upon default, and subject to SLT's right to redeem, Price II had a right to SLT's entire financial interest in the partnership, including the right to sue for damages caused to the partnership interest after SLT's default.[7] Because SLT never exercised the right to redeem the collateral, the private foreclosure sale cut off whatever rights SLT may have had. Once the private foreclosure sale was accomplished, whatever financial interest SLT retained in the Partnership by way of its right to redeem transferred to the purchaser, Price III. As Bromberg and Ribstein write: "The principal change in the creditor's

---

[6]Under the Texas Uniform Partnership Act, "[t]he dissolution of a partnership is the change in the relationship of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Tex.Rev.Civ.Stat.Ann. art. 6132b, § 29 (Vernon 1970). The district court's discussion continued by holding that Price I then reconstituted the partnership by agreeing to permit Price II to become a partner, but this determination is unnecessary to the analysis by that court or this, and we do not endorse it.

[7]At the time of SLT's default, the Prices had not yet committed any of the acts upon which SLT bases its cause of action.

current status as a result of the foreclosure and sale is that the creditor now owns the partner's entire financial interest in the partnership, including all amounts ultimately due the partner on dissolution after settlement of liabilities." Bromberg & Ribstein, *supra,* at § 3.05(d)(3).

Both parties agree that, at the very least, a dissolution occurred on November 26, 1985, when Price II foreclosed on SLT's partnership interest. Upon default and dissolution, Price II became entitled to all amounts that would have ultimately been due to SLT after the dissolution. Whatever rights SLT retained through its right to redeem the collateral disappeared when the private foreclosure sale t ransferred all of SLT's remainder interest to Price III. In light of its failure to redeem the collateral, SLT has no right to assert claims for pecuniary losses suffered after November 26, 1985. The causes of action that allegedly accrued to a partner after the Price II foreclosure thus belonged to Price II, not to SLT.

3. *SLT's Right to Redeem the Collateral*

SLT alternatively defends its standing to sue as a partner by asserting its right to redeem the collateral, and it hopes to achieve "redemption" by nullifying the private foreclosure sale.[8] Accordingly, Thomas argues that because Price III was not a good faith purchaser of SLT's fifty-percent partnership interest when it purchased from Price II on September 10, 1986, the sale was a nullity, and, therefore, SLT continues to retain its statutory right of redemption. This argument rests on the impropriety of the private foreclosure sale by Price II vis-à-vis U.C.C. § 9.504(d)(2). Again, Thomas' arguments are misdirected.

Thomas attempts to disparage the propriety of the sale of the collateral through innuendo by repeated reference to the private nature of the sale. A sale of collateral is not subject to closer scrutiny when the secured party chooses to dispose of the collateral through a private sale rather than

---

[8]Thomas did not exercise his opportunity to redeem the collateral before its private sale. He must *nullify* that sale to succeed here. Our discussion assumes without deciding that nullification of the foreclosure sale was a proper remedy for a violation of U.C.C. § 9.504.

a public sale. Indeed, the official comment to section 9.504 indicates that private sale may be the preferred method of disposition.

> [I]t is hoped that private sale will be encouraged where, as is frequently the case, private sale through commercial channels will result in higher realization on collateral for the benefit of all parties. The only restriction placed on the secured party's disposition is that it must be commercially reasonable.

Tex.Bus. & Com.Code Ann. § 9.504 cmt. 1 (Vernon 1991). In this case, where the collateral was an interest in a partnership, a private sale was almost certain to result in a higher realization on the collateral. Thus, rather than calling into question the propriety of the sale, Price II's use of a private sale would ordinarily tend to benefit the parties involved, and Thomas has never intimated that Price III did not tender sufficient consideration to Price II when it bought SLT's partnership interest.

According to Thomas, however, the real vice in this private sale was that Price II sold to Price III, an entity that was not acting in good faith. Section 9.504(d) of the U.C.C. specifies the consequences for a debtor when a secured party disposes of the collateral to a purchaser for value:

> (d) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or liens subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this subchapter or of any judicial proceedings
>
> > (1) In the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or
> >
> > (2) In any other case, if the purchaser acts in good faith.

Tex.Bus. & Com.Code Ann. § 9.504(d) (Vernon 1991). To support his argument, Thomas relies on the official comment to this section, which reads in part: "Where the purchaser for value has bought at a private sale he must, to receive the protection of paragraph [ (2) ], qualify in all respects as a purchaser in good faith." *Id.* cmt. 4. Even if we accept Thomas's argument that Price III was not and could not be a good faith purchaser of SLT's partnership interest, Thomas offers no authority for his assertion that this, in itself, is sufficient to nullify a foreclosure sale to Price III that otherwise satisfies

the U.C.C. and to revive SLT's right of redemption.

Thomas's argument misunderstands the meaning of U.C.C. § 9.504(d). The first sentence of that section states the general rule that a purchaser for value takes all of the debtor's rights in the collateral and discharges the security interest and any subordinate liens. The assumption is implicit that the secured party has complied with the requirements of Article 9 of the U.C.C., in particular the requirements of notice and commercial reasonableness of the sale. The second sentence of section 9.504(d), including subsections (1) and (2), is a savings clause that protects a purchaser for value in some instances even when the secured party has failed to comply with the stated requirements. In other words, even when the secured party has failed to comply with the requirements of notice and commercial reasonableness, a purchaser for value at a private sale obtains all of the debtor's rights and discharges the security interest and subordinate liens as long as the purchaser acts in good faith. Conversely, unless there was a procedural defect in the foreclosure sale, resulting in a sale that was not on notice or on commercially reasonable terms, the statute does not question the qualifications of a purchaser "for value."

Texas courts have only infrequently considered section 9.504(d) of the U.C.C., and their decisions do not reach the question before us. *See, e.g., Dowler v. Delta Investment Housing, Inc.,* 834 S.W.2d 127 (Tex.App.—Eastland, 1992); *Bado Equipment Company v. Bethlehem Steel Corp.,* 814 S.W.2d 464 (Tex.App.—Houston [14th Dist.] 1991, no writ); *First City Bank–Farmers Branch v. Guex,* 677 S.W.2d 25 (Tex.1984); *Food City, Inc. v. Fleming Companies, Inc.,* 590 S.W.2d 754 (Tex.Civ.App.—San Antonio 1979, no writ); *Hubbard v. Lagow,* 576 S.W.2d 163 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). We may look for guidance to the decisions of other jurisdictions that have decided this and similar issues. *See Cohen v. Rains,* 769 S.W.2d 380, 386 (Tex.App.—Fort Worth 1989, writ denied); *United States v. Whitehouse Plastics,* 501 F.2d 692, 694–95 (5th Cir.1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975).

Harmonious with our construction of section 9.504(d)(2) is *Lichty v. Federal Land Bank of Omaha,* 237 Neb. 682, 467 N.W.2d 657, 14 U.C.C.Rep.Serv.2d 644 (1991).  There, the plaintiff sought replevin of a center pivot irrigation system that he had purchased from his father, a defaulting debtor, but which had been previously sold by private foreclosure sale to another purchaser.  The plaintiff argued that the prior sale was "void," because the secured creditor did not provide his father with reasonable notice of the time after which the secured party would dispose of the equipment as required by section 9.504(c) and because the prior purchaser did not act in good faith.  Following the clear language of the statute, the court addressed the issue of good faith only after its determination that the seller had failed to comply with the sale procedures specified by Article 9 of the U.C.C.  *Id.* at 659–61.  Because it was undisputed that the seller had not given the debtor notice of the proposed private sale, the court proceeded to consider the plaintiff's claim that the purchaser did not act in good faith.  *Id.* at 660.  The Nebraska Supreme Court found "nothing in the record" that suggested that the prior purchaser lacked good faith and affirmed the summary judgment of the district court.  *Id.* at 660–61.

In support of his argument that under section 9.504(d) a private foreclosure sale may be nullified because of the purchaser's lack of good faith alone, Thomas cites two cases:  *In re Four Star Music Co.,* 2 B.R. 454, 29 U.C.C.Rep. 343 (Bkrtcy.M.D.Tenn.1979);  *Sheffield Progressive, Inc. v. Kingston Tool Co.,* 10 Mass.App. 47, 405 N.E.2d 985, 29 U.C.C.Rep. 292 (1980).  Neither one supports Thomas' proposition.  In *Four Star Music,* for example, before the court ever considered whether the purchaser for value qualified as a purchaser in good faith, the court scrutinized the sale itself and found that the sale did not meet the standard of commercial reasonableness.  *Four Star Music,* 2 B.R. at 463.  So, too, in *Sheffield Progressive,* the court found the commercial unreasonableness of the sale before considering whether the purchaser acted in good faith.  *Sheffield Progressive,* 405 N.E.2d at 987.

Section 9.504(d) requires that before the court may reach the issue whether Price III was a

good faith purchaser of SLT's partnership interest, it must be determined that the secured party, Price II, failed to comply with the pertinent requirements of Article 9. Those requirements include adequate notice to the debtor before the sale and commercial reasonableness. *See Greathouse v. Charter National Bank–Southwest,* No. D–0296, 1992 W.L. 148109, at *1 —— S.W.2d ——, —— (Tex. July 1, 1992) ("Section 9.504 of the Uniform Commercial Code requires that collateral must be disposed of in a commercially reasonable manner." (citation omitted)); *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 771 (Tex.1982) ("The only limits on the creditor's disposition of the collateral is [sic] that it must be commercially reasonable...."); *see also Martinez v. Corpus Christi Area Teacher's Credit Union,* 758 S.W.2d 946, 952 (Tex.App.—Corpus Christi 1988, writ denied). In light of the several notices he received of an impending private sale of SLT's partnership interest and of the right to redeem, Thomas could not and does not question his notice. He has also utterly failed to argue that the sale itself was commercially unreasonable. Thomas has neither argued that he was not allowed an opportunity to redeem the collateral prior to the sale or to bid on the collateral at the private sale, nor does the record suggest that the price paid at the sale was artificially or unreasonably low. Instead, Thomas has chosen to air the Prices' dirty laundry before the court in an effort to show that the Prices did not act in good faith. *See, e.g., Price v. Commissioner,* 88 T.C. 860 (1987). He contends that Price III cannot be a good faith purchaser of SLT's partnership interest because the trustee and beneficiary of Price III are dishonest people. But in spite of his zeal to denigrate the Prices, Thomas has failed to set forth facts that will sustain a reasonable inference that the private sale was commercially unreasonable.

Because Thomas has not created a fact issue suggesting that Price II did not comply with the requirements of Article 9, it is unnecessary to reach the issue of the purchaser's good faith. Under section 9.504, the procedurally adequate sale transferred to Price III all of SLT's rights in the collateral at the time of the sale. SLT's right, if any, to pursue all of its causes of action against the partnership or against the Price group for post-default mismanagement of the partnership was cut off

by the sale to Price III.[9]

Accordingly, the district court's summary judgment is AFFIRMED.



[9]Our decision does not interfere with the judgment Thomas received in his own right for management fees owed by the partnership. Thomas has not properly preserved a claim regarding impairment of the collateral. Thomas' procedural challenges against the magistrate judge's disinterestedness and the district court's failure to permit him to file a third amended complaint are meritless.