**Elizabeth Crowder AUSTIN, individually and as administratrix of the Estate of Andrew C. Austin, deceased, Heidi Elizabeth Austin, and Frank Barksdale Austin Plaintiffs**

**v.**

**WILL–BURT COMPANY and QUICK SET INTERNATIONAL, INC. Defendants**

**No. 4:00CV187–M–B.**

United States District Court,
N.D. Mississippi,
Greenville Division.

Nov. 25, 2002.

---

James P. Cothren, Cothren Law Firm, Jackson, MS, R. Jeffrey Lewis, Joseph G. Van Winkle, Lewis, Webster, Johnson, Van Winkle & Devolder, Des Moines, IA, for plaintiffs.

W. Scott Welch, III, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS, for Will-Burt Co., defendant.

Robert S. Addison, Daniel, Coker, Horton & Bell, Jackson, MS, Wilton V. Byars, III, Daniel, Coker, Horton & Bell, Oxford, MS, for Quick Set Intern., Inc.

Jim Bullock, Shell, Buford, Bufkin, Callicutt & Perry, Jackson, MS, for Radio Waves, Inc., defendant.

John D. Price, Wise, Carter, Child & Caraway, Jackson, MS, for California Microwave, Inc., defendant.

## *MEMORANDUM OPINION*

Mills, District Judge.

This cause comes before the court on the defendant's motion for summary judgment [57–1]. Upon due consideration of the parties' motions and memoranda, the court finds as follows:

### *FACTS*

The plaintiffs, Elizabeth C. Austin, Heidi Elizabeth Austin and Frank Barksdale Austin are the surviving mother, sister and father, respectively, of Andrew C. Austin ("Austin"). Elizabeth C. Austin is the appointed Administratrix of Austin's estate. The only remaining defendant, the Will–Burt Company ("Will–Burt"), was started by William Shontz and Burton Cope in Orrville, Ohio, to build coal furnaces and heaters. Will–Burt expanded to the manufacture of building steel parts and eventually began building pneumatic telescoping masts.

The telescoping masts are constructed of aluminum tubes nested inside each other until extended by air pressure. There are no federal or state regulations (i.e. OSHA or ANSI standards) that dictate how the masts should be constructed or how they should perform. The military, border control, firefighters, and the television broadcast industry use Will–Burt masts for different purposes. This case involves one of Will–Burt's masts which was built in 1982 for use in the television broadcast industry on an electronic news-gathering van ("ENG van"). Will–Burt sold this particular mast in 1982 to Quality Coach of Elkhart, Indiana. In 1989, this mast resurfaced by reference in an invoice from a business called Alan W. Haines, Custom Construction ("Haines"). The invoice indicates that the mast had been "completely rebuilt." Mississippi Telecasting Company d/b/a WABG–TV purchased the mast from Haines along with several other component parts from Mobile Manufacturers and three defendants who have previously settled. WABG–TV integrated the component parts into an ENG van for use at WABG–TV. WABG–TV also incorporated the use of a bungee cord to hold the pressure switch for the mast in the desired position for raising and lowering the mast. Will–Burt originally sold the mast with constant pressure switches so that the operator had to continually control the mast while raising or lowering it. Will–Burt was unaware that WABG–TV purchased the mast it had sold to Quality Coach.

Austin was a twenty-four-year-old college graduate employed as a production manager by WABG–TV in Greenville, Mississippi. One of his duties at WABG was

to set up the TV station's ENG van for remote broadcasts. This duty entailed operating the telescoping mast on the van. Austin received safety training from his supervisor, Donnie Reid. He was trained to check for obstructions before raising the mast, to ensure that the ENG van was on level ground, and pursuant to station policy, to keep a clearance of at least twenty feet from any power line if the mast was to be raised.

On June 17, 1997, Austin was assigned to a live shot at Greenville City Hall, three blocks from the WABG–TV station and within the direct line of sight of the station's antenna. A WABG–TV ENG van was being set up to conduct a live broadcast of a City Council meeting taking place at the Greenville City Hall. The van was parked underneath visible transformers and power lines by someone other than Austin. The Will–Burt mast attached to the van, while being raised, contacted an 8000–volt power line. The voltage went down the mast and into the van and energized the van and its extending cables. Austin walked to the van, touched it, and was electrically shocked to death.

The plaintiffs have filed this lawsuit to recover damages for pain and suffering experienced by Austin between the time of the accident and the time of his death and to recover the funeral and burial expenses associated with his death and burial. The plaintiffs are asserting the following theories of liability:

(1) Products Liability

 (a) the mast was defective and unreasonably dangerous when it left Will–Burt's hands in 1982;

 (b) inadequate warning

 (c) breach of express and implied warranties of merchantability, fitness, and safety;

(2) Negligence in

 (a) Failing to provide remote control device to operate the mast

 (b) Failing to include non-conductive, insulating and/or grounding materials with mast

 (c) Failing to equip the mast with a proximity warning device

 (d) Failing to recall the mast to retrofit it with proximity warning device/remote control

 (e) Failing to provide adequate post-sale warnings

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Id.* If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1088 (5th Cir.1990).

The moving party bears the initial burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986). Once the burden of the moving party is discharged, the burden shifts to the nonmoving party to go beyond the pleadings and show that summary judgment is inappropriate. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990). The nonmoving party is obligated to oppose the

motion either by referring to evidentiary material already in the record or by submitting additional evidentiary documents which set out specific facts indicating the existence of a genuine issue for trial. Fed. R.Civ.P. 56(e). To sustain the burden, the nonmoving party must produce evidence which would be admissible at trial. *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). If the opponent fails in his duty, summary judgment is implicated. *Id.* Similarly, if the opponent fails to meet its burden regarding an essential element of his claim, summary judgment is implicated. *Celotex* at 323, 106 S.Ct. 2548.

## *ANALYSIS*

### I. PRODUCTS LIABILITY

Mississippi's doctrine of strict liability is codified at Miss.Code Ann. §§ 11–1–63 (1972). This section provides, in pertinent part;

(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) 1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

2. The product was defective because it failed to contain adequate warnings or instructions, or

3. The product was designed in a defective manner, or

4. The product breached an expressed warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

#### a. Inadequate Warnings

Under the theory of products liability, the plaintiffs claim that Will–Burt's mast was defectively designed and unreasonably dangerous when it left Will–Burt's control in 1982 because of inadequate warnings. The plaintiffs first assert that the warnings are inadequate because they direct the operator to go to another source—the "INSTRUCTIONS"—for additional guidance, information or warnings. Second, the plaintiffs contend that the warning labels were affixed to the mast at an inadequate location. The warning was located such that the person reading the warning would have to actually be inside the back of the van or standing in the doorway on the side of the van looking toward the back of the van. If the operator is required to stand outside the van to raise the mast, as Will–Burt claims would be the proper position, the operator would not be looking at or located in close proximity to the warnings. The plaintiff also complains that no warnings were provided to the effect that the ENG van and its appurtenances could become electrified.

■ Under Mississippi law, a warning may be held adequate as a matter of law where the adverse effect was one that the manufacturer specifically warned against. *Cather v. Catheter*, 753 F.Supp. 634, 640 (S.D.Miss.1991) (citations omitted). The two labels Will–Burt affixed to the mast warned the operator to look for overhead lines and to read the product's instructions:

●DANGER! PLEASE READ INSTRUCTIONS BEFORE RAISING!
●DANGER. WATCH FOR WIRES. YOU CAN BE *KILLED* IF THIS PRODUCT COMES NEAR ELECTRICAL POWER LINES.

 The labels were located on the base of the mast inside the van in bright yellow with red and black lettering. The instructions in the product manual also warned never to raise the mast under or near power lines and for the operator to check for obstructions within the proximity to the maximum height of the mast. Those warnings accompanied the mast when it left Will–Burt's control in 1982, and they were on the mast on the day of Austin's accident. They specifically cautioned the operator that he could be killed if the mast were raised near power lines. In Mississippi, such notice has been held to be adequate as a matter of law. The plaintiff has not proved that the product was defective for failing to contain adequate warnings or instructions when it left the control of the manufacturer. Accordingly, the court finds summary judgment is appropriate as to this issue.

Next, the plaintiffs claim liability against Will–Burt for breach of express and implied warranties of merchantability and fitness.

### b. Express Warranty

The plaintiffs assert that Will–Burt's promotional materials warranted the mast's use in conjunction with an ENG van and that it was safe to use for such purposes. It is undisputed that Will–Burt was unaware that WABG–TV had acquired its mast nearly ten years after the mast's original sale was made to Quality Coach. The plaintiffs argue that regardless of the original purchaser, Will–Burt knew that the mast would become part of an ENG van and that it would be used for live television news-gathering in urban areas.

 An express warranty is any affirmation of fact or promise which concerns the product and becomes part of the basis for the purchase of such a product. *Albritton v. Coleman Co.*, 813 F.Supp. 450, 455 (S.D.Miss.1992). Fault does not need to be shown to establish a breach. *Id.* The plaintiff need only show that the product did not live up to its warranty. *Id.* If any express warranty was rendered, the more likely party to such a warranty would be Quality Coach, to whom Will–Burt sold the mast, not to Austin or WABG–TV. Will–Burt was not even aware that WABG–TV had acquired the mast nearly ten years after Will–Burt made its original sale to Quality Coach. Neither the plaintiffs nor WABG–TV have proved that they relied on Will–Burt's guarantees as a basis for purchasing the mast. As such, the court finds that no express warranty could have existed between Will–Burt and the plaintiffs. As to this issue, summary judgment should be granted.

### c. Implied Warranties

The plaintiffs bring overlapping claims for breach of an implied warranty of merchantability or fitness for intended use. They argue that Will–Burt knew when it shipped the mast that it would be incorporated into an ENG van and that it would be used for live television broadcasts in urban areas where power lines are present.

Implied warranty of merchantability is governed by Miss.Code Ann. § 75–2–314. The statute provides that:

(2) Goods to be merchantable must be at least such as:

 (a) pass without objection in the trade under the contract description; and

 (b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label, if any.

Will–Burt admits knowing the masts would be incorporated into ENG vans and that they would be used for live television broadcasts in urban areas where power lines are present. The mast at issue was built twenty years ago for use in the television broadcast industry on an ENG van. Will–Burt claims that the mast was intended for surveillance, elevated testing, electronic news-gathering and wireless cable testing and that the mast conformed to those promises or affirmations. The mast's function was to raise and lower payloads, and that is exactly what it did. According to Will–Burt, the mast performed exactly as intended when it left Will–Burt's control and it performed exactly as intended on the day of Austin's accident, that is, it raised and lowered payload to provide for a live feed broadcast in the television industry. Will–Burt notes that the mast functioned properly, raising and lowering the payload for remote broadcasts, for seven and one half years without incident at WABG–TV. The court finds that the plaintiff has not carried its burden of proving that the masts were not fit to be used in live television broadcasts. Summary judgment should be granted as to this issue.

Miss.Code Ann. § 75–2–315 covers the implied warranty of fitness for a particular purpose. The section states that:

"where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill and judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose."

Under Mississippi law, the warranty for fitness for a particular purpose does not apply where plaintiffs did not purchase the product from the defendants as the plaintiffs never relied on the skill or knowledge of the defendant's representative in picking the product, but, rather, purchased the product from a third-party. *Albritton v. Coleman Co.,* 813 F.Supp. 450, 455 (S.D.Miss.1992). It is undisputed that Will–Burt did not sell the mast to WABG–TV. WABG–TV purchased the mast from Haines nearly ten years after Quality Coach purchased it from Will–Burt. Austin and WABG–TV did not rely on a Will–Burt representative or the knowledge of a Will–Burt representative in selecting the mast. There were no statements of material fact concerning the quality or the use of the subject mast by Will–Burt to Austin or WABG–TV. Because there was no reliance by the plaintiffs or WABG–TV on Will–Burt in the purchase of the mast, warranty for fitness for a particular purpose does not apply. As such, the plaintiffs' claim regarding breach of warranty of fitness fails and summary judgment should be granted.

### d. Defective Design

The fourth theory set out by the plaintiffs under products liability is defective design. The plaintiffs complain that Will–Burt had feasible design alternatives in 1982 which would have had reasonable probability of preventing the harm without impairing the mast's utility. In order to prevail on a claim of design defect, plain-

tiffs must prove that, at the time the product left the manufacturer's control:

(i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; **and**

(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

Miss.Code Ann. § 11–1–63(f).

■ Relative to this claim, and in order for the plaintiff to recover from the manufacturer of this mast, the plaintiff must prove by a preponderance of the evidence that the mast left the hands of the manufacturer containing defects which made it unreasonably safe for its intended use and purpose, that the mast had not been changed or altered between the time it left the hands of the defendant's control and the date the plaintiff was injured, and that as a direct and proximate result of such defective condition, if any, the plaintiff sustained injuries. *Hageney v. Jackson Furniture of Danville, Inc.*, 746 So.2d 912, 924 (Miss.App.1999).

■ It is undisputed that the mast was altered after it left Will–Burt's control. The invoice from Haines Construction indicates that the mast was "completely rebuilt" before WABG–TV acquired it from Haines. It is also undisputed that once WABG–TV acquired the mast, WABG–TV made its own alterations. WABG–TV altered the constant pressure switch that raises and lowers the mast by "jimmy-rigging" it with a bungee cord so as to allow the operator to leave the van and perform other functions. The only switches Will–Burt provided for its masts were ones requiring constant pressure, designed to keep the mast operator's attention focused on the mast as it was raised. Austin was trained to raise the mast using the bungee cord. Will–Burt maintains that the bungee cord overrode the constant pressure switch—the feature designed to keep the operator safe. Will–Burt believes the accident would not have occurred had Will–Burt's safety feature not been altered and had Austin been watching the mast rise as was originally intended by Will–Burt. Considering that the mast was altered first by Haines and then again by WABG–TV, the court concludes that the plaintiff did not prove that the product left the manufacturer's control in a defective condition which made it unreasonably safe for its intended use and purpose or that it was that condition that was the cause of Austin's injury. Summary judgment is proper on this claim and is granted.

### (i) Alternative Design

The plaintiffs assert that Will–Burt had feasible design alternatives in 1982, when it manufactured and shipped the mast. The plaintiffs argue that Will–Burt could have manufactured the mast so as to allow it to be raised with a remote control device.

#### *remote control device*

The parties disagree as to whether non-hard-wired remote controls were available in the industry in 1982. Assuming the non-hard-wired remote controls were available, the plaintiffs did not prove that the technology would have prevented the accident. It is reasonable to believe that a hard-wired remote could also be jimmy-rigged to operate without observation so as to allow the operator to perform other

functions as the mast was raised. The injury Austin incurred was partly due to the crude remote control device WABG–TV rigged up so that he could be free to do other activities while the mast was raised and lowered. A remote control device would not have a reasonable probability of preventing operator injury.

### insulation

The plaintiffs contend that Will–Burt should have insulated the mast to prevent it from conducting electricity down the mast and into the ENG van and its appurtenances. Will–Burt's response is that although that manufacture may have been possible in 1982, it was not feasible then and it is not feasible today. The nonconductive material would become conductive in the ordinary use upon exposure of the mast to rain, dirt, dust, oil, grime, salt, gravel and other pollutants. Will–Burt further explains that constructing the top portion of the mast of a non-conductive material would be useless since the payload—pan and tilt devices, etc—placed on top of the mast in ENG vans is made of conductive materials, which parts could come into contact with overhead wires. Including, but not limited to these reasons, insulation will not work and is not employed by anyone in the broadcast industry.

### proximity warning device

A third alternative design the plaintiff presents is that the mast should have been equipped with a proximity warning device (pwd), a detector of the proximity of power lines. The plaintiff argues that pwds can and do prevent power line accidents. Will–Burt states that no pwd existed for use in the broadcast industry in 1982 and through most of 1990. Sigalarm's president and CEO (a supplier of pwds) testified that a Sigalarm was not used by a TV station on ENG vans until 1996. Though Will–Burt had 50% of the broadcast mast

industry business in the 1980's, Sigalarm did not approach Will–Burt until nearly 15 years after the mast at issue left Will–Burt's control. Will–Burt tested the Sigalarm in 1996 on a mast at its Ohio plant. It then tested the Sigalarm on an ENG van at WMFD–TV. The station reported that the Sigalarm improved the safety of the ENG work environment.

Will–Burt began developing its own pwd in 1996—the D–TECas it felt an adequate one did not exist for broadcast purposes. It began shipping its patented pwd to consumers in 1998, after it perfected the sensitivity setting and added a tilt detection feature and 16 years after the mast at issue left Will–Burt's control. Will–Burt maintains that the necessary technology had not been developed "so as to craft an adequate pwd for the broadcast industry in 1982."

 In order to prevail on this claim the plaintiff must prove that a feasible design alternative would have, to a reasonable probability, prevented the harm. Evidence presented by the plaintiff states that the Border Patrol used the Sigalarm with the Will–Burt mast to raise infrared surveillance cameras into the air for 15 years and had no power line contacts. The Border Patrol had, among other things, configured the Sigalarm device so that a Klaxon would sound and the mast could not be extended when a power line was detected. Will–Burt contends that using the Sigalarm in the broadcast industry was not feasible at that time since it was not adequate pursuant to Will–Burt's standards for use in the broadcast industry. No television stations utilized that device until 1996. While the plaintiff has offered evidence that the Sigalarm pwd was being successfully used by the Border Patrol, it did not successfully carry the burden of proving that a feasible design alternative was available for use in the *broadcast in-*

dustry that would have, to a reasonable probability, prevented the harm to Austin. The court finds that mast design choice in 1982 did not include proximity warning safety devices that were available and within the state of the art of mast safety design.

The court concludes that summary judgment is appropriate with regard to the alternative design claim and is, therefore, granted.

## II. NEGLIGENCE

Two issues the plaintiff listed under the negligence claim not addressed under the products liability section of this opinion are failing to recall the mast to retrofit it with proximity warning device/remote control, and failing to provide adequate post-sale warnings.

Under Mississippi law, if the plaintiffs have established that a defect in a product exists, the plaintiffs can use negligence as a theory against the manufacturer. *Albritton v. Coleman*, 813 F.Supp. 450, 454 (S.D.Miss.1992).

> The prima facie case for liability based on strict tort liability is shown by the existence of a strict duty owed by a commercial supplier of a product to the plaintiff and that the breach of the defendant of that duty caused actual and proximate damage. The duty of the defendant is to supply a safe product. In order to establish breach of that duty, the plaintiff must show the product is defective and the defect must then render the product unreasonably dangerous. . . .

*Id.* at 455. Since the court has determined that the plaintiffs were unable to establish, from the record, that Will–Burt's mast was defective, and because the negligence claim reiterates the products liability claim which the court has rejected, the court concludes that the plaintiffs' negligence claim must also fail.

## CONCLUSION

For the foregoing reasons, the court finds that the defendant's summary judgment motion is well-taken and shall be **GRANTED**:

A separate order in accordance with this opinion will issue this, the 18th day of November 2002.