**James C. THOMAS, Individually, and as Trustee of the SLT Trust #1, Plaintiff–Appellant,**

v.

**N.A. CHASE MANHATTAN BANK, Defendant–Appellee.**

No. 92–2613.

United States Court of Appeals, Fifth Circuit.

June 22, 1993.

Frederick L. Unger, Houston, TX and Bernard M. Jung, Kansas City, MO, for appellant.

Karen A. Oshman and Franci N. Crane, Susman & Godfrey, Houston, TX, for appellee.

Before POLITZ, Chief Judge, REAVLEY, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

James C. Thomas appeals the summary judgment awarded N.A. Chase Manhattan Bank in his action for fraud, arising from Chase's referral of an investment partner. Addressing only the standing issue for the present, we AFFIRM in part, REMAND for further findings, and defer ruling on the remaining issues pending remand.

## I.

As provided in the summary judgment record,[1] Thomas, in partnership with a Thomas family trust and the Cha family trust (the Cha–Thomas partnership), purchased a Texas private banking franchise in 1980 (the franchise).[2] The Cha–Thomas partnership operated the franchise as the Church & Thomas Bank (Unincorporated) (the bank) in Galveston, Texas, with Thomas as its compensated manager. From February 1981 to November 1983, the principal activity of the Cha–Thomas partnership, through the bank, was "to provide financial support to ventures involving the acquisition of companies" (the Acquisition Ventures). Chase was the exclusive lender to the Acquisition Ventures, and both Chase and the Cha–Thomas partnership profited from the enterprise.

In 1981, Thomas and Chase became involved in the formation of an investment enterprise known as Columbia Investors (the project), which was to offer $100 million in shares and limited partnership units to investors in management buyout opportunities. Two Chase entities and the Church & Thomas Bank were to serve as placement agents for the offering; and Stanhope Associates, Inc., was retained as its manager. Thomas was one of four shareholders in Stanhope, and was to serve as one of its officers during Stanhope's management contract with Columbia Investors. Chase was to serve as financial consultant to Columbia Investors. Chase could withdraw from or suspend Columbia Investors at any time, in which case the project could not go forward.

Chase began marketing Columbia Investors in May 1982, but shortly thereafter suspended the project, assertedly only tempo-

---

1. As discussed *infra*, we view the summary judgment record in the light most favorable to Thomas, the non-movant. Contrary to Chase's assertions at oral argument in our court, the summary judgment record is substantial. It includes, among other things, two lengthy affidavits by Thomas, with several exhibits, outlining his dealings with Chase, a stipulation of facts, and documents from Chase's litigation with other entities on related subjects. Except for one by its attorney, Chase did not file any affidavits. In addition, it relied on the stipulation of facts, and

excerpts, as well as an exhibit, from Thomas's deposition.

2. The franchise was one of only a few remaining which had been "grandfathered" in under new banking regulations. Because of its freedom from regulatory requirements, it had valuable capabilities as a vehicle for banking opportunities. The Cha family trust owned 80 percent of the partnership; Thomas individually and the Thomas family trust, the remainder.

rarily. Pursuant to the suspension, Chase made Stanhope a $490,000 loan in July 1982. The loan was guaranteed by Thomas Construction Company, a Thomas family corporation, for which Thomas was a director. According to Thomas, Columbia Investors agreed to reimburse Stanhope for the loan. Although the project had not yet resumed, Chase later renewed the Stanhope loan through 1984.

Meanwhile, in 1983, the Chas decided to sell their interest in the franchise. Aware of this, Robert Lichten, Chase's executive vice president and the officer in charge of the Columbia Investors project, suggested Newcomb Securities Company, which he represented to be a long-time, highly valued Chase customer, as a potential new partner for Thomas in the franchise.[3] Lichten told Thomas that Newcomb had enlisted Chase to help it purchase a bank. At a luncheon in New York organized by Chase, Thomas met E. Lawrence Price (Price) and others, whom Chase introduced as partners in Newcomb.

Ultimately, in November 1983, the SLT Trust # 1 (SLT) (a Thomas family trust of which Thomas was trustee) and the Elaine Price Trust (a Price family trust of which Price was trustee) formed a partnership (the Price–Thomas partnership), which purchased the franchise from the Cha–Thomas partnership. As provided in the stipulation of facts in this case, the Cha–Thomas partnership obtained a fair price. The Price–Thomas partnership formation also included collateral agreements: Price Family Holdings, Ltd., and Newcomb agreed to indemnify Thomas Construction Company for 50 percent of its guaranty obligations on the Stanhope loan; and the Price–Thomas partnership executed a management contract with Thomas for him to continue to manage the bank.

In October 1983, prior to the formation of the Price–Thomas partnership, Lichten approached Thomas to solicit a $250,000 fee for Chase, which had been promised by Price and Newcomb, for services rendered by Chase in the organization of the Price–Thomas partnership. Thomas resisted the request as excessive, but agreed to pay $37,750

through the Price–Thomas partnership following its formation, assertedly in fear of damaging future relations with Chase regarding Columbia Investors. Following the transaction, the Price–Thomas partnership paid the agreed fee to Chase.

Pursuant to the sale, an agent of the Chas, William Wu, investigated Newcomb and Price to determine their creditworthiness to close the sale. Based on "sketchy and incomplete information" which he described as second-hand rumors, Wu heard about, and advised Thomas of, "a banking problem" involving Newcomb in Chicago. Wu would not disclose the source of his information, but agreed that Thomas should contact Chase for an explanation. Thomas did so, and was advised by Chase vice president Mary Small that Chase had thoroughly reviewed all aspects of the Chicago incident and that it was just "unpleasantness"—"simply a routine banking relationship that didn't work out". Small assured Thomas that he could rely on Chase's superior knowledge resulting from its extensive due diligence on Price and Newcomb. Small reconfirmed that Newcomb was a long-time, highly valued Chase client and that Chase was acting as sponsor for Price, and advised Thomas not to pursue or listen to rumors. Based upon these assurances, the Price–Thomas partnership was formed and the franchise sale consummated.

In the years following the sale, however, Price breached the indemnity agreements on the Stanhope loan, ousted Thomas from the bank in breach of his management contract and the partnership agreement, and then used the bank to conduct a massive government securities tax fraud, which ultimately drove it into insolvency. In 1985, Chase informed Thomas that it was abandoning Columbia Investors and Acquisition Ventures, citing as its reasons Newcomb's default on the Stanhope indemnity agreements and the resulting disputes. Through discovery, Thomas assertedly learned that Chase subsequently transferred the Acquisition Ventures and Columbia Investors projects to other entities, which have profited greatly.

---

**3.** Initially, Lichten had suggested that Chase join Thomas in partnership in the franchise, but sub-

sequently learned that this would violate federal banking law.

Thomas later learned that Price had conducted the same type of fraud in Chicago prior to the franchise sale, for which he suffered a Tax Court judgment in April 1987. Additionally, after being required to move his accounts out of a Chicago bank in late 1979, Price allegedly transferred his operations to Chase's government securities clearing department, conducting the fraud there through an entity known as Bankers Discount. Pursuant to an investigation of the Bankers Discount fraud, Chase allegedly fired several employees. Chase ultimately sued Bankers Discount in another action, but the record does not indicate its disposition. Thomas also learned that Chase had terminated its credit relationship with Newcomb in August 1983, before the Price–Thomas partnership was formed.

In May 1989, Thomas sued Price in federal court, alleging various claims, and obtained a judgment in that action for breach of his management contract. *See Thomas v. Price*, 975 F.2d 231 (5th Cir.1992). During that litigation, Thomas learned that Chase, allegedly contrary to banking regulations, had destroyed all of its documents relating to the transactions between Thomas and Price in 1983.

Thomas, individually and on behalf of SLT, brought this action against Chase in 1989, alleging basically that Chase had fraudulently "foisted" Price onto him pursuant to a cover-up of Chase's role in the Bankers Discount fraud. Ultimately, the complaint included claims of fraud, conspiracy to defraud, negligent misrepresentation, breach of contract (relating to Chase's withdrawal from the Columbia Investors project), and breach of fiduciary duty.[4] Thomas sought damages for (1) the destruction of his partnership interest in the franchise; (2) the destruction of his interest in Columbia Investors; (3) breach of the Stanhope indemnity agreements (Thomas Construction Company honored its guaranty obligation when Stanhope defaulted); (4) breach of his management contract with the bank (his judgment against Price assertedly is uncollectible); (5) injury to his reputation and business interests; and (6) litigation costs from the action against Price.

■ Following some discovery, Chase filed a second motion for summary judgment in April 1992 (earlier, its motion had been denied pending further discovery), contending that any reliance on Chase's alleged misrepresentations was not justifiable as a matter of law, and that there was no evidence to support a claim for breach of contract. *See* note 4, *supra.* In July 1992, the district court granted the motion, ruling orally that (1) Thomas did not have standing, individually or as trustee of SLT, to sue Chase on any of the claims;[5] (2) Thomas did not justifiably rely on any representations made by Chase; and (3) the alleged breach of contract postdated the suspension of the Columbia Investors project, which, in any event, was barred by the statute of frauds and the parole evi-

4. This case was stayed from May 1990 until January 1992. Multiple versions of a "First Amended Complaint" appear in the record in a series of confusing motions, orders, and filings. At a status conference in early January 1992, the district court apparently denied Thomas's May 1990 motion to add the fiduciary duty and conspiracy claims to the original fraud claim, but did grant leave to add breach of contract and negligent misrepresentation. Thomas then filed another motion to amend to include the very claims (fraud, negligent misrepresentation, and breach of contract) that the district court had just permitted. This time, however, the district court denied the motion, and ordered Thomas to file a bill of particulars instead.

Thomas filed the bill in mid-March 1992; and on April 1, 1992, Chase moved for summary judgment, but addressed only fraud, negligent misrepresentation and breach of contract. It contended that, although Thomas also asserted breach of fiduciary duty and conspiracy to defraud in the bill of particulars, the district court had denied leave to file those two claims.

Thomas immediately again moved to amend to include all five claims, which the district court granted in mid-June 1992. Although the proposed complaint was attached to this motion, Thomas never filed it once granted leave to do so; and Chase never answered it. Nonetheless, at the summary judgment hearing in early July 1992, after the court rebuked Thomas for adding those claims without permission, it proceeded to address them. Because the district court addressed all five claims and granted summary judgment as to the entire case, we consider all five as well.

5. Apparently, standing was raised *sua sponte* during a pretrial conference early in the case.

dence rule.[6]

## II.

Thomas contends that (1) he has standing to sue Chase on each cause of action; (2) genuine issues of material fact exist regarding justifiable reliance and whether Chase breached a fiduciary duty to Thomas; and (3) the Columbia Investors claim was not barred by the statute of frauds or the parole evidence rule. For the reasons to follow, we presently address only standing.

■ As noted, we review a summary judgment *de novo,* applying the same criteria as would a district court. *Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). "Summary judgment is proper only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law' ". *Harbor Ins. Co. v. Trammell Crow Co.,* 854 F.2d 94, 98 (5th Cir.1988), *cert. denied,* 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989) (quoting Fed.R.Civ.P. 56(c)). "We consider all of the facts contained in the [summary judgment record], and the inferences to be drawn therefrom in the light most favorable to the non-moving party". *Harbor Ins. Co. v. Urban Constr. Co.,* 990 F.2d 195, 199 (5th Cir.1993). (Even when

confronted with Thomas's lengthy, detailed affidavit in opposition to its motion, Chase did not file any affidavits in response. *See* note 1, *supra.*) Furthermore, "[o]ur review is not limited to the district court's analysis"; we may affirm on any basis presented to the district court. *Id.*

## A.

■ It goes without saying that in a diversity action, we apply state substantive law. *Turner v. Purina Mills, Inc.,* 989 F.2d 1419, 1421 (5th Cir.1993); *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Chase asserts that New York, rather than Texas, law applies.[7] In determining which state's substantive law controls, we apply choice-of-law principles of the forum state—in this case, Texas. *Trizec Properties, Inc. v. United States Mineral Products Co.,* 974 F.2d 602, 604 (5th Cir.1992); *Klaxon Co. v. Stentor Electrical Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). And, for cases sounding in tort, such as this one, Texas applies the "most significant relationship" test from the Restatement (Second) of Conflicts, §§ 6 and 145.[8] *Gutierrez v. Collins,* 583 S.W.2d 312, 318–19 (Tex.1979).

---

6. The foregoing is taken from the district court's colloquy with counsel *and Thomas* during the summary judgment hearing; it did not make findings of fact and conclusions of law. Although, pursuant to Fed.R.Civ.P. 52(a), they "are unnecessary on decisions of [summary judgment] motions", and our review of the summary judgment record is *de novo,* we have often emphasized that findings of fact and conclusions of law are "permissible and often quite helpful for appellate review". *Boazman v. Economics Lab., Inc.,* 537 F.2d 210, 213 n. 5 (5th Cir.1976); *see also Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 644 (5th Cir.1992) (stating that a district court must "explain its reasons for granting a motion for summary judgment in sufficient detail for us to determine whether the court correctly applied the appropriate legal test"); *Williamson v. Tucker,* 645 F.2d 404, 411 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (noting that "an explanation of the basis of the district court's decision can be invaluable even in cases where Rule 52(a) clearly does not require findings of fact"). As we noted in *Chandler v. City of Dallas,* 958 F.2d 85, 89 (5th Cir.1992) (bench trial), "the preparation of sufficiently complete conclusions of law augments our com-

prehension of the legal issues on appeal". This is no less applicable where, as here, Rule 52(a) does not require the court to make legal conclusions. Accordingly, when a summary judgment is granted, we urge the district court to provide findings of fact and conclusions of law.

7. The district court did not decide the question. In any event, we freely review this legal issue. *Salve Regina College v. Russell,* 499 U.S. 225, ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

8. Section 6 directs a court to consider the following factors: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied".

Section 145 provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the

The following New York contacts are not disputed: (1) Chase is domiciled there; (2) Chase made the alleged misrepresentations there; (3) negotiations between Thomas and Price regarding the formation of the Price–Thomas partnership occurred there; and (4) Thomas's business relationship with Chase, including the discussions regarding Columbia Investors, was based there. Although the Price–Thomas partnership was organized under Texas law, its general partners, SLT and the Elaine Price Trust, are organized under the laws of Missouri and Wyoming, respectively; and Thomas is a Missouri resident. The only other apparent tie with Texas is the bank's location in Galveston. In light of these contacts, especially because Thomas's claims arise from his dealings with Chase in New York, we hold that New York, rather than Texas, law governs.[9]

### B.

Standing is, of course, a prerequisite to our exercise of Article III power. *Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174, 1176 (5th Cir.1993) (*en banc*). "To satisfy the requirements of Article III, [a] plaintiff[ ] must have suffered an 'injury in fact,' caused by the [defendant's conduct], which is likely to be redressed by the relief [he] seek[s]". *Id.* at 1176. A plaintiff " 'generally must assert [his] own legal rights and interests' ". *Id.* (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982)). Contrary to the focus of Thomas's argument on appeal, standing does not turn on the existence of a

cause of action. Rather, the issue is whether Thomas, individually or as trustee of SLT, is the proper party to assert any cause of action.[10]

The district court held that Thomas lacked standing because the franchise was sold by one partnership (Cha–Thomas) to another (Price–Thomas); thus, neither Thomas nor SLT were parties to the sale. But, Thomas's claims arise not only from the sale, but also from both the very formation of the Price–Thomas partnership, *cf., e.g., Belgo Asian Diamond Cy. v. European American Bank & Trust Co.*, 168 A.D.2d 345, 562 N.Y.S.2d 668 (N.Y.App.Div.1990) (diamond dealer, who extended credit to customer based on bank's representation that customer's account was satisfactory, sued bank for fraud and negligent misrepresentation), and the subsequent formation of his management contract with the Price–Thomas partnership. Therefore, we must determine whether either of those events resulted in injury in fact to Thomas or SLT, and if so, whether those injuries are likely to be redressed by the relief sought. We address SLT and Thomas in turn.

### 1.

Because SLT became a general partner in the Price–Thomas partnership, its formation caused injury in fact to SLT, which is likely to be redressed by the damages sought for destruction of SLT's partnership interest in the franchise and litigation costs incurred by SLT in the action against Price. Obviously, however, Thomas cannot seek damages on behalf of SLT relating to Columbia Investors, the Stanhope indemnity agreements, Thomas's management contract, or injuries

---

state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6", and lists the following contacts to be taken into account and evaluated according to their relative importance with respect to the particular issue: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered".

9. Buttressing our conclusion is the fact that Thomas did not brief this issue. *See Zeno v.*

*Great Atlantic & Pacific Tea Co.*, 803 F.2d 178, 180–81 (5th Cir.1986) (issues not briefed are waived); Fed.R.App.P. 28(a)(5).

10. For this reason, his reliance on *Tew v. Chase Manhattan Bank, N.A.*, 728 F.Supp. 1551 (S.D.Fla.), *amended*, 741 F.Supp. 221 (S.D.Fla. 1990), is misplaced as to standing. That case did not address standing, and in any event, involved the trustee of a bankrupt company who sued Chase for failing to disclose to the company's creditors and government officials that the officers and directors of the company, which had a clearing contract with Chase, were perpetrating fraud. Thus, even factually, Thomas does not stand in the same position as the plaintiff in *Tew.*

to Thomas's business reputation, because SLT had no involvement in those matters. Needless to say, Thomas has Article III standing on behalf of SLT only to the extent that he is asserting its legal rights.

■ Of course, in addition to satisfying Article III, Thomas must have the capacity to sue on behalf of SLT. *See* Fed.R.Civ.P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest".). Rule 17(a) provides that a "trustee of an express trust ... may sue in that person's own name without joining the party for whose benefit the action is brought ...". "[C]ourts must look to the substantive law creating the right being sued upon to determine compliance with the real party in interest requirement ...". *Piambino v. Bailey,* 610 F.2d 1306, 1321 (5th Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *see also Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 256–57 (5th Cir.1980).

■ Because SLT is a Missouri trust, we look to Missouri law to determine Thomas's capacity to sue on its behalf. Under that law, the trustee of an express trust has the power "[t]o prosecute or defend actions, claims, or proceedings for the protection of trust assets and of the trustee in the performance of his duties", Mo.Rev.Stat. § 456.-520.3(25), *unless* limited by the trust instrument, *see* Mo.Rev.Stat. § 456.510(1). But, because the record is silent on whether the SLT trust instrument limits the trustee's ability to bring suit on its behalf, we cannot determine whether Thomas is the real party in interest, as required by Fed.R.Civ.P. 17(a). We must remand, therefore, to the district court for findings of fact on that issue.

### 2.

The only manner in which Thomas (individually) was involved in the various transactions was (1) as a partner in the Cha–Thomas partnership which sold the franchise, (2) as a shareholder in Stanhope, which was to manage Columbia Investors, and (3) as a party to the management contract with the Price–Thomas partnership.

First, with respect to the franchise sale by the Cha–Thomas partnership, Thomas's standing would depend on his capacity to assert the rights of that partnership. At oral argument in our court, however, Thomas disclaimed reliance on his status in either partnership as a basis for standing. Moreover, he has stipulated that the Cha–Thomas partnership obtained a fair price for the franchise, so there was no injury in fact to it.

■ Second, as a shareholder in Stanhope, Thomas is barred from pursuing any legal rights Stanhope has against Chase, because those rights belong to the corporation, not its shareholders. "Generally, corporations have an existence separate and distinct from that of their shareholders ... and an individual shareholder cannot secure a personal recovery for an alleged wrong done to a corporation ...". *New Castle Siding Co. v. Wolfson,* 97 A.D.2d 501, 502, 468 N.Y.S.2d 20, 21 (N.Y.App.Div.1983) (50% shareholder attempted to sue defendant for breach of contract between defendant and corporation). Furthermore, "[t]he fact that an individual closely affiliated with a corporation (for example, a principal shareholder, or even a sole shareholder), is incidentally injured by an injury to the corporation does not confer on the injured individual standing to sue on the basis of either that indirect injury or the direct injury to the corporation ...". *Id.* Therefore, assuming that an enforceable contract existed between Stanhope and Columbia Investors and that Chase had obligations under it, Thomas cannot recover for alleged wrongs done Stanhope.

■ Finally, the only valid basis for Thomas's standing in his individual capacity is his management contract with the Price–Thomas partnership, in that he allegedly relied on Chase's misrepresentations in entering into it. In that limited respect, Thomas has standing to seek recovery to the extent that those misrepresentations caused him to suffer injury. He claims such injury from the subsequent breach by Price, to his business reputation, and from litigation costs in the action against Price (to the extent that

they were incurred by him individually).[11]

### 3.

 In claiming injury relating to Columbia Investors and the Stanhope indemnity agreements, Thomas lacks standing in either his individual capacity or as trustee of SLT. With respect to any profits the bank may have expected as placement agent for Columbia Investors, standing would depend on Thomas's or SLT's partnership status in either the Cha–Thomas partnership or the Price–Thomas partnership, because any such profits would accrue to the bank's owners, i.e., the partnerships, not to Thomas or SLT. As noted, however, Thomas expressly denies reliance on partnership status. And, with respect to the Stanhope indemnity agreements, Thomas Construction Company, not Thomas, was required to honor the guaranty obligation when Price breached. For the reasons stated above, and because of the separate corporate identity of Thomas Construction Company, Thomas cannot sue to enforce its rights.

In sum, Thomas has standing in his individual capacity to assert claims against Chase only to the extent that they arise from his execution of the management contract with the Price–Thomas partnership. Thomas lacks standing to seek damages relating to the Stanhope indemnity agreements and Columbia Investors, which disposes of his entire breach of contract claim and the remaining claims to the extent that he seeks to assert rights that legally belong to Stanhope.

### III.

For the foregoing reasons, we AFFIRM the summary judgment in part, for lack of standing, on the breach of contract (Columbia Investors) claim in its entirety and on the other claims to the extent that Thomas seeks damages for breach of the Stanhope indemnity agreements. We REMAND to the district court for the limited purpose of obtaining findings regarding Thomas's capacity to sue on behalf of SLT.

11. We stress that we are addressing standing only and do not express any opinion on the

We reserve decision on the merits of the remaining claims until the remand issue is resolved. As stated in note 11, *supra,* in so doing, we express no view on the validity of the remaining claims with respect to any issues other than standing. Pending remand, this court retains jurisdiction over the appeal, and the record shall remain with this court, to be supplemented by the evidence presented on remand and the findings by the district court. The district court is requested to make such findings within 30 days.

validity of these claims, either in law or in fact.