Tracy Parker STREBER and Terry Parker Davis Delony, Plaintiffs,

v.

Edwin HUNTER; Camp, Carmouche, Barsh, Gray, Hoffman & Gill, a professional law corporation; Eston Singletary; Edwin Hunter Professional Law Corporation; Jamison Dupuy; Hunter & Boland; T. Glynn Blazier; Timothy O'Dowd; and Hunter, Blazier O'Dowd & Moreno, a professional law corporation, Defendants.

No. A–96–CA–476–SC.

United States District Court, W.D. Texas, Austin Division.

April 30, 1998.

See also, 138 F.3d 216.

Brad Rock Reagan, Brad Rock Reagan & Associates, Austin, TX, C. Brooks Schuelke, Perlmutter & Reagan, L.L.P., Austin, TX, for Tracy Parker Streber.

Edward P. Watt, Watt & Associates, P.C., Austin, TX, Daniel R. Castro, Watt & Associates, P.C., Austin, TX, Daniel R. Castro, Watt & Associates, P.C., Austin, TX, for Terry Parker Davis Delony.

Joe K. Longley, Longley & Maxwell, Austin, TX, Casey L. Dobson, Sam Johnson, Scott, Douglas, & Luton, Austin, TX, David M. Taylor, Thompson, Coe, Cousins & Irons, Dallas, TX, for Edwin K. Hunter, Hunter & Boland, T. Glynn Blazier, Timothy O'Dowd, Hunter, Blazier, O'Dowd & Moreno.

John R. Hays, Jr., Austin, TX, for Carmouche, Barsh, Gray, Hoffman & Gill.

Robert Gilchrist Newman, Fulbright & Jaworski, Houston, TX, Stacy Ann Martinez, Fulbright & Jaworski, Austin, TX, John B. Scofield, Scofield, Gerard, et al, Lake Charles, LA, for Eston Singletary.

Tracie J. Renfroe, Bracewell & Patterson, Houston, TX, Casey L. Dobson, Sam Johnson, Scott, Douglas, & Luton, Austin, TX, for Jamison Dupuy.

Joe K. Longley, Longley & Maxwell, Austin, TX, for Coregis Ins. Co.

*OPINION*

CAPELLE, United States Magistrate Judge.

Before the Court are the following pleadings:

1. Attorney Defendants Hunter, Dupuy, Hunter & Boland, Blazier, O'Dowd, and Hunter, Blazier et al[1] Motion to Compel Application of Louisiana Law to the Claims Against the Attorney Defendants filed December 1, 1997 (Doc. # 69); Plaintiff Streber's Response to Attorney Defendants' Motion filed December 22, 1997 (Doc. # 92); Plaintiff Delony's Response to Attorney Defendants' Motion filed December 23, 1997 (Doc. # 98); Defendants' Reply filed January 27, 1998 (Doc. # 111);

2. Defendants' Motion for Summary Judgment based on Louisiana Limitations Law filed December 1, 1997 (Doc. # 70) and Appendix (Doc. # 72); Plaintiff Streber's Response and Appendix filed December 22, 1997 (Docs. # 88 & # 90); Plaintiff Delony's Response and Appendix filed December 23, 1997 (Docs. # 96 & # 99); and Defendants' Reply filed January 27, 1998 (Doc. # 110).

3. Defendants' Motion for Summary Judgment based on Texas Limitations Law filed December 1, 1997 (Doc. # 71) and Appendix (Doc. # 72); Plaintiff Streber's Response to Attorney Defendants' Motion based on Texas Limitations Law and Appendix filed December 22, 1997 (Docs. # 89 & # 90); Plaintiff Delony's Response and Appendix filed December 23, 1997 (Docs. # 97 & # 99); Defendants' Reply filed January 13, 1998 (Doc. # 104) and Reply filed January 15, 1998 (Doc. # 105); and Plaintiff Streber's Reply filed February 4, 1998 (Doc. # 113).

After review of the pleadings and relevant law, the Court finds as follows:

## I. BACKGROUND

In short, this case involves alleged attorney malpractice in a tax case. The underlying case was a dispute between the Internal Revenue Service and Tracy Parker Streber, Terry Parker Davis Delony, and Larry Parker, the sisters' father, as to who owed taxes on money Tracy and Terry received in 1985. Although the facts are convoluted, the undersigned summarizes them as follows, keeping in mind that all disputed facts are resolved in favor of Plaintiffs, Tracy Parker Streber and Terry Parker Davis Delony.

In 1979, Plaintiffs' father, Mr. Larry Parker—a non-party to this malpractice suit—set up a real estate joint venture involving 440 acres of undeveloped property in Harris County, Texas (the Northgate Forest property). Parker's two daughters, Terry and Tracy Parker (the Parker sisters or sisters), received a percentage interest in the joint venture, held in trust for them by a trustee (J. Robert Bradish) On March 4, 1981, the investors sold the land involved in the joint venture, and Terry and Tracy each received notes for $2 million, representing their professed share of the proceeds. The notes indicated that the notes would mature on March 4, 1985. However, there is some evidence that there was no guarantee at that time that the sisters' possession of the notes would in actuality result in any monetary payment to them.

Disputes arose among the participants in the real estate joint venture and the makers of the notes, which disputes were finally settled in April of 1985. As a result of the gift of the notes to them by their father and the settlement in April of 1985, Terry and Tracy each received $1.7 million dollars on April 23, 1985 and a half interest each in real property in Houston with a total approximate value of $225,000. This was the first time the Parker sisters received any cash proceeds as a result of the real estate joint venture.

In 1982, Larry Parker and the Parker sisters' mother, Betty, were divorced. By 1985, both were remarried, Larry to Martha A. Parker and Betty to Lee Berwick. After the sisters received the money in April of 1985, a dispute arose between the Parker sisters and their father concerning his desire to "manage" the money pursuant to an agreement previously signed by the sisters

---

1. Unless a motion is filed by an individual defendant and is so indicated, the collective "Defendants" will refer to all defendants.

giving him control over any proceeds until each sister reached the age of twenty-five.[2]

In May of 1985, the sisters sought advice from Edwin Hunter and other members of his Lake Charles, Louisiana law firm[3] concerning the dispute with their father and also how the money should be reported to the Internal Revenue Service. The sisters chose Mr. Hunter and his law firm because Mr. Hunter had handled tax matters for the sisters' stepfather, Lee Berwick, since 1969.[4]

Mr. Hunter is an attorney specializing in tax work who is licensed in both Louisiana and Texas. Hunter provided the sisters with two basic alternatives: (1) pay capital gains tax on the income they received; or (2) treat the income as a gift from their father, who would then be liable for any gift taxes due. In accordance with this advice, the sisters and Terry's husband, Stephen Davis, reported the proceeds of the notes on their tax returns as a 1985 gift from Larry Parker—with taxes on the proceeds owed by their father.[5]

On October 22, 1991, the Commissioner issued statutory notices of deficiency[6] to Tracy, Teresa, and Stephen for 1985, stating that the sisters and Stephen should have included the joint venture income they received in their 1985 returns and assessing past due taxes, interest, and penalties. The IRS based this assessment on its determination that the sisters received the property forming the basis for the 1985 proceeds in 1979. The IRS also sent a notice of deficiency to Plaintiffs' father, Larry Parker, indicating that he also owed [the same] back taxes based on his "gift" to the sisters in 1985.

Plaintiffs were therefore the subject of an IRS "whipsaw." From the perspective of the IRS, a "whipsaw" occurs when taxpayers treat the same transaction involving the same income inconsistently, thus creating the possibility that the income might go untaxed. *See Bouterie v. Commissioner of Internal Revenue*, 36 F.3d 1361, 1373–74 (5th Cir. 1994), *citing Wickert v. Commissioner*, 842 F.2d 1005 (8th Cir.1988).[7] When a whipsaw occurs in tax returns, the IRS frequently takes inconsistent positions, essentially arguing that one of the parties is liable even if it doesn't know which party it is. For that reason, it is not uncommon for the IRS to assess the same taxes on two different taxpayers, essentially pitting the taxpayers against each other and requiring each taxpayer to assert that it is the *other* taxpayer's tax liability. Thus, the central and dispositive issue before the Tax Court was a question of fact as to whether the money represented a 1985 gift or was a gift given in the underlying transaction in 1979.

Both Larry Parker and the sisters contested the notices of deficiency in Tax Court in Houston, Texas and the cases were consolidated before the Tax Court. Attorney defen-

---

**2.** Terry was twenty-four and Tracy was nineteen at the time the dispute arose.

**3.** At that time, the firm at which Mr. Hunter worked was named Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill. Mr. Hunter thereafter left the firm and formed Hunter & Boland in 1987 and later left and formed Hunter, Blazier, O'Dowd & Moreno. Plaintiffs remained as clients of Camp, Carmouche for a short period of time after Mr. Hunter left but essentially "followed" Mr. Hunter as he moved firms. The attorney defendants are all members of at least one firm with which Mr. Hunter was associated.

**4.** In 1985, Plaintiffs' father filed suit against Plaintiffs and their mother and stepfather, Betty and Lee Berwick, in state court in Houston to enforce the management agreement. Mr. Hunter and members of his firm represented the Berwicks and the Parker sisters in that suit.

**5.** Obviously, Larry Parker did not pay gift taxes on the $3.4 million proceeds from the notes, presumably because he characterized the funds as capital gains profits to the sisters from his earlier gift, thus putting the duty to pay taxes on the sisters.

**6.** The Notice of Deficiency is dated October 22, 1991. Plaintiffs have not alleged a specific date for receipt of the notice, but indicate that it was received in 1991.

**7.** In *Wickert*, a former husband sought to deduct certain payments to his wife as alimony, while his former wife sought to exclude these same payments from her taxable income, claiming they were part of a property settlement. To avoid this whipsaw, the IRS issued notices of deficiency to both former spouses, disallowing the former husband's deduction and requiring the former wife to include the payments as income. When the former husband did not contest the disallowance, the IRS conceded its case against his former wife.

dants Edwin Hunter and Timothy O'Dowd and their law firm, Hunter & Blazier, continued to represent the sisters through the Tax Court litigation.

After protracted and costly litigation, the Tax Court, applying Texas law related to gifts and ownership of property, determined that the 1985 proceeds were a result of a 1979–80 gift from Larry Parker and that each sister owed the IRS taxes and interest from tax year 1985. The Tax Court also confirmed the assessment of significant penalties for negligence and substantial understatement of tax liability as well as interest thereon. The sisters' Tax Court assessment of taxes due was approximately $1.6 million each, with interest continuing to accrue on the entire amount.

Throughout the IRS proceedings, the attorney defendants consistently assured the sisters that the position they had taken was correct and that their father owed the tax. Indeed, Defendant Hunter still believes that the ultimate Tax Court finding that the sisters owed the underlying tax was incorrect.

The representation of the sisters by the attorney defendants was terminated in April of 1996. Over the course of the eleven years of representation, the sisters paid the attorney defendants in excess of $300,000 in legal fees.

After the Tax Court decision, the sisters hired new attorneys and appealed the decision to the Fifth Circuit Court of Appeals. On April 15, 1998, the Fifth Circuit issued a divided opinion reversing the Tax Court in part and finding that although the sisters were liable for the original back taxes and interest thereon,[8] they were not liable for the large penalties assessed for negligence and substantial understatement. As such, the sisters' current tax liability is for the amount they would have owed had they reported the

income on their 1985 tax returns, plus interest on the amount from 1985 to the present.

During the pendency of the appeal of the Tax Court case, Plaintiffs filed suit in Austin state court against Defendants[9] alleging negligence, breach of fiduciary duty, violations of the Texas Deceptive Trade Practices Act (DTPA), negligent misrepresentation, fraud, and breach of contract. On July 19, 1996, Defendants removed the case to the United States District Court, Western District of Texas based on diversity. United States District Judge Sam Sparks was initially assigned this case. The parties thereafter consented to the jurisdiction of the Magistrate Court pursuant to 28 U.S.C. § 636(c) and the case was transferred to the undersigned's docket for all purposes.

In an early stage of this litigation, Defendants wanted the case abated pending resolution of the tax appeal because "the underlying lawsuit which gives rise to this legal malpractice case has not been finally adjudicated." *See Hunter Defendants' Response to Motion to Lift Abatement.* This Court ultimately determined that discovery in the case should proceed but trial would most likely not be held until the Fifth Circuit opinion was issued. Because the Fifth Circuit ruled on this case two weeks ago, the case can now proceed.

Defendants now move for the application of Louisiana law to this case, move for summary judgment based on the Louisiana statute of limitations, and alternatively move for summary judgment based on the Texas statute of limitations, which motions are obviously opposed by Plaintiffs. Because the choice of law affects which motions will be applicable, the Court first determines which state's law controls this case.

8. The sisters did not appeal the finding that they were liable for the underlying tax on the income. Rather, they conceded liability on the underlying tax based on the Tax Court's factual finding that they owned the notes prior to their maturing. The sisters focused their appeal on obtaining a reversal of the large penalties assessed by the Tax Court for the sisters' alleged negligence and substantial understatement.

9. Plaintiffs sue five attorneys and the law firms in which they practiced at the time they represented Plaintiffs. All of the law firms appear to have been connected with Edwin Hunter. All of the attorney defendants are residents of Louisiana. Although some of the defendants initially moved to dismiss for lack of personal jurisdiction, the undersigned found that the exercise of long-arm jurisdiction was appropriate due to each defendant's contacts with the State of Texas.

## II. CHOICE OF LAW

■ In diversity cases in which there is a dispute as to which state's law controls, federal courts apply the choice-of-law principles of the forum state, in this case Texas. *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Lawrence v. Virginia Ins. Reciprocal,* 979 F.2d 1053, 1055 (5th Cir.1992); *Thomas v. N.A. Chase Manhattan Bank,* 994 F.2d 236, 241 (5th Cir.1993) (citing *Trizec Properties, Inc. v. United States Mineral Products Co.,* 974 F.2d 602, 604 (5th Cir.1992); *Klaxon Company v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021– 22, 85 L.Ed. 1477 (1941)).

■ In Texas, the "most significant relationship" test, as enunciated in Sections 6 and 145 of the Restatement (Second) of Conflicts, governs conflicts cases. *Askanase v. Fatjo,* 130 F.3d 657, 670–71 (5th Cir.1997); *citing Duncan v. Cessna Aircraft,* 665 S.W.2d 414, 421 (Tex.1984); *see also Minnesota Mining and Manufacturing Co. v. Nishika, Ltd.,* 953 S.W.2d 733, 735–36 (Tex. 1997); *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979). When applying the "most significant relationship" test, the court should look not only to the number of contacts in each state, but "the qualitative nature of those contacts." *Gutierrez,* 583 S.W.2d at 319.

■ Section 6 of the Restatement sets out the general principles involved in an analysis of the "most significant relationship" as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(b) When there is no such directive, the factors relevant to the applicable rule of law include

 (a) the needs of the interstate and international systems;

 (b) the relevant policies of the forum;

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

 (d) the protection of justified expectations;

 (e) the basic policies underlying the particular field of law;

 (f) certainty, predictability and uniformity of result; and

 (g) ease in the determination and application of the law to be applied.

*Askanase,* 130 F.3d at 671, n. 7; *Minnesota Mining,* 953 S.W.2d at 736, both citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).

■ When applying the § 6 principles, a court should consider the following factual matters listed in § 145(2) of the Restatement:

 (a) the place where the injury occurred;

 (b) the place where the conduct causing the injury occurred;

 (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

 (d) the place where the relationship, if any, between the parties is centered.

■ These contacts are to be evaluated according to their relative importance with respect to the particular issue. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145. Application of the "most significant relationship" analysis should not turn on the number of contacts listed in Section 145, but rather on the qualitative nature of those contacts as affected by the policy factors set out in § 6. *Gutierrez,* 583 S.W.2d at 319.

■ There is no set formula for determining the significance of any particular contact. Instead, the court must weigh the relationship on a case-by-case basis. *Id.* Once the significance of the contacts has been established, the question of which state's law to apply is one of law. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984).

■ In applying the above guidelines, the Court first considers the elements in § 6(2). Although Louisiana has a strong interest in protecting its attorneys from stale claims (as evidenced in its one year statute of limitations with discovery tolling and absolute three year peremptive statute of limitations), the Court believes that Texas' interest in protecting its citizens by applying the discovery rule to prevent the running of limitations is as strong if not stronger. Although these

attorneys certainly never anticipated being haled into Court in Austin, Texas, it was foreseeable when the representation began that litigation could likely ensue in Texas, especially considering that litigation was already occurring in Houston, Texas between the sisters and their father. The Tax Court litigation also occurred later on in Houston, Texas. As this Court previously found, Houston (which is in the Southern District of Texas) in actuality has the most contacts with this litigation, although Austin had sufficient contacts to maintain venue here.

Through Texas Supreme Court precedent,[10] Texas has repeatedly evidenced a strong desire to permit clients to sue their attorneys more than two years after malpractice occurred if they were unable to do so earlier, as otherwise it would be necessary to take conflicting positions in ongoing litigation. In contrast, Louisiana's Legislature has determined that limitations should run regardless of when misconduct is discovered and regardless of whether an attorney is continuing to represent a client in ongoing litigation. While Louisiana is free to make this policy choice for its own citizens and enforce it in its own courts,[11] the policy directly contradicts Texas precedent protecting the rights of Texas clients and arguably violates the Open Courts provisions by divesting an individual of a cause of action before he or she had reason to know it existed.

Although the Louisiana period is certainly easier to apply, the undersigned believes that the policy of Texas to protect its citizens outweighs any ease of application of the Louisiana period or any policy of Louisiana acting to extinguish claims before they are even realized to exist.

The undersigned next turns to the elements in § 145(2). The injury and conduct occurred both in Louisiana and Texas, in that the legal advice was given in Louisiana and the litigation in accordance with that advice occurred in Texas. The domicile of the plaintiffs is Texas and of the defendants, Louisiana. The relationship cannot be said to be "centered" either exclusively in Louisiana or Texas, since numerous contacts occurred in both states and both states have significant connections to the litigation.

The Court considers whether these parties, who most likely never anticipated malpractice litigation, would have expected that Louisiana law or Texas law would control a dispute if one ever arose. The sisters, Texas citizens, sought out Louisiana attorneys to give them advice as to general tax law and Texas law. The Court concludes that because the Tax Court suit in Houston ultimately turned on the application of Texas law to the factual issue of when the gift was made and this factual issue was the center of the attorney defendants' representation of the sisters, Texas law should control this case.

Therefore, the Attorney Defendants' Motion for Application of Louisiana law is **DENIED** and their Motion for Summary Judgment based on Louisiana Limitations is **DENIED.** The Court now turns to the motions for summary judgment based on Texas limitations law to the claims asserted by Plaintiffs.

## III. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the summary judgment procedure, the Court is required to review the facts and draw any inferences in favor of the plaintiffs. *Marshall v. East Carroll Parish Hospital Service Dist.,* 134 F.3d 319, 321 (5th Cir. 1998). Summary judgment is only proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56; *Elliott v. Lynn,* 38 F.3d 188 (5th

10. In 1991, the Texas Supreme Court issued the first of the relevant decisions. The Texas Legislature has met several times since then and could have altered the discovery rule and ongoing litigation exceptions to the legal malpractice statute of limitations if it chose to do so. The Legislature's failure to do so indicates agreement with the Court's application. *See, e.g.,* the Texas Medical Liability and Insurance Improvement Act, in which the Texas Legislature abrogated the discovery rule in medical malpractice cases. *Hall v. Dow Corning,* 114 F.3d 73, 76 (5th Cir.1997).

11. There is some question as to whether this absolute prohibition is constitutional. *See Reeder v. North,* 701 So.2d 1291 (La.1997)(court finding Louisiana statute peremptive and thus barred plaintiff's case but permitting plaintiff to replead to assert unconstitutionality of the statute).

Cir.1994), *cert. denied*, 514 U.S. 1117, 115 S.Ct. 1976, 131 L.Ed.2d 865 (1995). Once the moving party meets its Rule 56 burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. ANALYSIS

Plaintiffs bring causes of action for negligence, breach of fiduciary duty, violations of the Texas Deceptive Trade Practices Act (DTPA), negligent misrepresentation, fraud, and breach of contract, all claims arising from the alleged malpractice of members of the Hunter law firm.

■■■ Separating a claim for legal malpractice into claims for negligence, breach of contract, fraud, or other names does not change the underlying fact that the claims in actuality are based on professional negligence [12] and are therefore governed by the two year tort statute of limitations. *See Sledge v. Alsup*, 759 S.W.2d 1, 3 (Tex.App.— El Paso 1988, no writ); *see also Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex.1989) (legal malpractice action in Texas is based on negligence); *See also Estate of Degley v. Vega*, 797 S.W.2d 299, 302–03 (Tex.App.—Corpus Christi 1990, no writ); *Willis v. Maverick*, 723 S.W.2d 259, 261 (Tex.App.—San Antonio 1986), *aff'd*, 760 S.W.2d 642 (Tex.1988). In addition, the Texas statute of limitations for negligence, breach of fiduciary duty, and violations of the Texas Deceptive Trade Practices Act ("DTPA") is two years. Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (Vernon 1986); *FDIC v. Dawson*, 4 F.3d 1303, 1307, (5th Cir.1993), *cert denied*, 512 U.S. 1205, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994); Tex. Bus. & Com.Code Ann. § 17.565 (Vernon 1987). The sole cause of action which arguably has a four year statute of limitations is Plaintiffs' fraud claim.

Defendants assert that Plaintiff's causes of action accrued upon the giving of the tax advice in 1985. Plaintiffs counter that even if it accrued at that time, their cause of action was tolled pending their actual discovery that the advice was erroneous and in addition, their cause of action was part of a continuing violation, namely the repetition of the allegedly bad advice and also is subject to the ongoing litigation exception to the malpractice statute of limitations. In the alternative, Plaintiffs assert that because they were in an IRS "whipsaw" situation, their damages were not actually incurred until the Tax Court determined in December of 1995 that they should have paid capital gains taxes for tax year 1985.

■■■ Under Texas law, a person suffers legal injury from faulty professional advice when the advice is taken. However, "to avoid harsh and unfair consequences that may result from the premature running of the statute of limitations, Texas adopted the discovery rule." *State Farm Life Insurance v. Swift*, 129 F.3d 792, 796 (5th Cir.1997). Under this rule, the statute of limitations does not begin to run until the injured party discovers or with the exercise of reasonable care and diligence should have discovered that a particular injury has occurred. Because of the discovery rule, the statute of limitations "may begin to run on a date other than that on which the suit could first be maintained." *Id.*

The Fifth Circuit explained the operation of the discovery rule as follows:

> Consider a case of medical malpractice in which the treating physician has left a dangerous metal instrument inside the body of his patient. At the time the doctor finishes the surgery, the doctor has completed a tort. He has violated a legal duty owed to the patient, and the patient was injured by that violation. If the patient instituted suit at this moment, his suit would be viable. The statute of limitations has not begun to run, however. Under the discovery rule, the statute of limitations is or should be tolled until the patient either

---

**12.** The elements of a legal malpractice claim are: (1) a duty, (2) a breach of duty, (3) the breach proximately caused the injury, and (4) resulting damages. *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex.1989).

discovers or should have discovered that an injury has occurred.

*Swift,* 129 F.3d at 796.

 The discovery rule applies to delay accrual of a malpractice cause of action because of the difficulty a lay person has in knowing of the fault in the legal advice. "Legal malpractice, for example, is inherently undiscoverable because it is unrealistic to expect a lay client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney." *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988). Thus, the accrual of a legal malpractice claim, including a claim for faulty tax advice, is governed by the discovery rule. *Murphy v. Campbell,* 964 S.W.2d 265, 270–271, 41 Tex. Sup.Ct. J. 193 (1997) (addressing accountant malpractice).[13] "Such a claim accrues when the claimant knows or in the exercise of ordinary diligence should know of the wrongful act and resulting injury." *Id.* 964 S.W.2d at 271. In *Murphy,* the Court held that under the discovery rule, an accounting malpractice cause of action accrues when the claimant should know of his injury, which cannot occur later than the receipt of a deficiency notice in which the IRS takes a final, formal position. *Id.; see also Atkins v. Crosland* 417 S.W.2d 150 (Tex.1967) (holding that cause of action against accountants for faulty tax advice accrued upon client's receipt of notice of deficiency).

Plaintiffs contend that the tolling rule in *Hughes v. Mahaney & Higgins,* 821 S.W.2d 154 (Tex.1991), applies in the present case to prevent the statute from running from the time the deficiency notice was issued because the defendants in the present case, unlike the accountants in *Murphy,* are *attorneys* who continued to represent Plaintiffs in their dispute with the IRS (as opposed to merely being expert witnesses as in *Murphy*). In *Hughes,* a lawyer erred in failing to name his clients the temporary managing conservators of the child they planned to adopt, instead naming himself. When the biological mother had a change of heart, she sued for custody of the child and plaintiffs counterclaimed for termination of the mother's rights. The court of appeals reversed a judgment for plaintiffs, holding they lacked standing to assert their claim. Plaintiffs then sued their lawyer for malpractice, contending that they would have prevailed in the parental rights termination suit if they had been named temporary managing conservators originally. The Texas Supreme Court held that limitations was tolled on the malpractice claim during the pendency of the termination litigation because if limitations were not tolled, plaintiffs would have been required to file the malpractice suit while the termination suit was still pending, and to assert in one that their attorney's actions were proper and in the other that his actions were improper would result in their taking inconsistent litigation claims. *Id.* 821 S.W.2d at 156–157. The Court expressly limited the rule to attorney malpractice in the course of prosecution or defense of a claim that results in litigation.

The Court found it significant that to require the client to file a malpractice claim against the lawyer representing him in another case would make it virtually impossible for the lawyer to continue his representation. The client's only alternative would be to obtain other counsel. *Hughes,* 821 S.W.2d at 156–57; *see also Hoover v. Gregory,* 835 S.W.2d 668, 675 (Tex.App.—Dallas 1992, writ denied). Although a client has the right to terminate his representation, retain another attorney for the underlying litigation, and immediately sue his former attorney while the underlying litigation is still pending, a client should not be forced to this choice.

Plaintiffs cite to another case indicating the statute of limitations should be tolled. *See Gulf Coast Inv. Corp. v. Brown,* 821 S.W.2d 159 (Tex.1991). The Court in *Gulf Coast* held that tolling applied when an attorney's malpractice in conducting a non-judicial foreclosure resulted in a wrongful foreclosure action by a third-party against the client. *Gulf Coast,* 821 S.W.2d at 160. The only explanation offered by the Court regarding this extension of the *Hughes* doctrine is because it saw "no reason why the tolling rule ... should not apply when the attorney's malpractice results, not in an appeal on the underlying claim, but in a wrongful foreclosure action by a third-party against the

---

**13.** This opinion was issued in December of 1997, more than four months ago and was a 5–4 opinion. A motion for rehearing is still pending and the opinion has not been released for publication in the permanent law reports. Until released, the opinion is subject to revision or withdrawal.

client," noting that the viability of the second cause of action depends on the outcome of the first. *Id.* 821 S.W.2d at 160.

The doctrine has also been applied when an attorney neglected to sue all tortfeasors in a wrongful death action, because requiring the client to bring a malpractice action against her lawyer prior to concluding litigation against the served tortfeasors "would jeopardize the client's claims against the remaining defendants." *Sanchez v. Hastings,* 898 S.W.2d 287, 288 (Tex.1995). Moreover, the Texas Supreme Court held that "if the client must carefully scrutinize every stage of the case for possible missteps, it would erode the trust between client and lawyer necessary for the successful prosecution of litigation." *Sanchez,* 898 S.W.2d at 288.

For tolling to apply, the San Antonio Court of Appeals has held that the malpractice must be alleged to have occurred in connection with the actual prosecution or defense of a claim. *Burnap v. Linnartz,* 914 S.W.2d 142 (Tex.App.—San Antonio 1995, writ denied). In *Burnap,* the plaintiff claimed that attorneys committed malpractice in connection with the preparation and execution of partnership and corporate documents. The court found that because the attorneys did not represent the plaintiff in subsequent litigation resulting from the preparation of the documents (and the alleged malpractice), the rationale for the *Hughes* tolling doctrine—to prevent the client from being forced into adopting inherently inconsistent litigation postures in the underlying case and in the malpractice case—was inapplicable.[14] *Burnap,* 914 S.W.2d at 148, *citing Ponder,* 889 S.W.2d at 643–44.

Defendants allege that because there was no ongoing litigation at the time the advice was given and at the time the deficiency notice was issued, the statute of limitations on Plaintiffs' claims has expired. However, the Court notes that in *Hughes,* the alleged malpractice did not occur in ongoing litiga-

tion, but rather prior to litigation. *Hughes,* 821 S.W.2d at 154

In *Gulf Coast,* the alleged malpractice occurred in a non-judicial foreclosure sale. *Gulf Coast,* 821 S.W.2d at 160. Although the malpractice in *Gulf Coast resulted* in a suit for wrongful foreclosure, the malpractice itself did not occur in a judicial proceeding. *Id.* Similarly, in the current case, while there may not have been ongoing litigation for the entirety of the representation, the tax advice clearly formed the basis of the subsequent Tax Court proceedings.

In the case at bar, the Attorney Defendants began their collective representation of Plaintiffs in 1985. This representation continued through the termination of the Tax Court proceeding in late 1995 and continued into early 1996. Plaintiffs retained new attorneys around May of 1996.

Defendants assert that the fact that they continued to represent Plaintiffs for several years does not toll the running of limitations. The Court disagrees. Unlike cases cited by Defendants—which dealt with limitations beginning to run due to receipt of a deficiency notice because it is an event which should put the taxpayer on notice of a risk of harm to his interests—the present case involves a situation in which the deficiency notice was merely one more step in the very long history of the dispute. Because the case involved a "whipsaw" and because the Attorney Defendants assured Plaintiffs that their father was the real object of the IRS' agenda, as a matter of law the Court cannot say that the sisters were aware of the possibility of damage to their interests at the time the deficiency notice was issued.

■ Regardless, the Court finds that even if the cause of action accrued and the statute began to run upon the sisters' receipt of the deficiency notice, the statute was tolled based on the ongoing litigation exception from January, 1992 [15] through the end of the

---

**14.** The Court also held on alternative grounds that the plaintiff did not have an attorney/client relationship with the sued attorney defendants. That holding is obviously inapplicable in the case at bar.

**15.** *Ponder v. Brice & Mankoff* is distinguishable from the case at bar. *Ponder* found it significant that the attorneys did not represent the plaintiff

at the time of the alleged malpractice. Rather, the plaintiff hired the attorneys to defend him against the IRS subsequent to the notice of deficiency. The malpractice at issue was based on the attorneys giving a different client bad tax advice—on which advice the plaintiff had erroneously relied in deducting certain investment losses. *Ponder,* 889 S.W.2d at 644.

Attorney Defendants' representation of the sisters. To accept otherwise would clearly have obligated Plaintiffs to take contradictory positions in different lawsuits: arguing in the tax case that the gift occurred in 1985 and in the malpractice case that Hunter's advice was erroneous and they should have reported the income as capital gains from a 1980 gift.[16] Initiation of a malpractice lawsuit also would have required the sisters to terminate Hunter's representation at a time when they had already invested a significant amount of time and money in Hunter and O'Dowd's representation of them in the Tax Court litigation. The Court notes that by the time Plaintiffs filed the present suit, they were no longer arguing that the income was a 1985 gift, thus conceding that the Tax Court determination that they owed the underlying tax was correct. As such, the sisters' claim that the Attorney Defendants committed malpractice in advising them to contest liability because the income was a gift is entirely consistent with the arguments made in the Tax Court appeal.

The Court finds that Plaintiffs' causes of action are not barred because Plaintiffs were involved in litigation—as contemplated in *Hughes*—from the time of the issuance of the notice of deficiency (or alternatively, institution of suit in Tax Court in January of 1992) until the attorneys' representation ceased in April of 1996. The Court believes that, with respect to these defendants, the statute of limitations began to run, at the earliest, when the attorneys' representation of Plaintiffs ended, i.e., April of 1996. As such, suit was timely filed.

In other words, the Court finds that with respect to claims arising prior to the notice of deficiency, the statute of limitations did not start to run until the deficiency notice was issued in 1991. The claims (and any new claims accruing during the actual Tax Court litigation) were tolled from January of 1992 (if not earlier) due to the ongoing litigation exception. Therefore, the Court finds that all of Plaintiffs' claims are not barred by the statute of limitations.

16. The Court notes that Defendants previously moved for abatement (which was subsequently lifted) on the basis that the underlying litigation

## V. CONCLUSION

The Court determines that Texas law applies to this case. For that reason, Defendants' Motion for Application of Louisiana Law is **DENIED** and Defendants' Motion for Summary Judgment under Louisiana Law is **DENIED**. The Court finds that the Defendants' Alternative Motion for Summary Judgment based on Texas Limitations Law will be **DENIED**.

was not final. If the litigation was not final, then Plaintiffs' claims clearly are not barred.